## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **THE MOST REVEREND THOMAS G. WENSKI, Archbishop of the ARCHDIOCESE OF MIAMI, a corporation sole; CATHOLIC HEALTH SERVICES, INC.; and CATHOLIC HOSPICE, INC.** )<br><br>*Plaintiffs*, )<br>**v.** )<br><br>**KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department of Health and Human Services; HILDA SOLIS, in her official capacity as Secretary of the U.S. Department of Labor; TIMOTHY GEITHNER, in his official capacity as Secretary of the U.S. Department of Treasury; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF LABOR; and U.S. DEPARTMENT OF TREASURY,** )<br><br>*Defendants*. ) | CIVIL ACTION NO.: _____<br><br>JUDGE: _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

1.      This lawsuit is an attempt to vindicate one of America's most fundamental freedoms: the freedom to practice one's religion without governmental interference.  The United States Government (the "Government") is now attempting to force Plaintiffs -- all Catholic entities -- to provide, pay for, and/or facilitate access to abortion-inducing drugs, sterilization, and contraception in violation of their sincerely held religious beliefs.  Plaintiffs acknowledge that individuals in this country have a legal right to these medical services; they are, and will continue to be, freely available in the United States, and nothing prevents the Government itself from making them more widely available.  But the right to such services does not authorize the Government to co-opt religious entities like Plaintiffs into providing or facilitating access to them.  Indeed, American history and tradition, embodied in the First Amendment to the United States Constitution and the Religious Freedom Restoration Act, codified at 42 U.S.C. § 2000bb *et seq.* ("RFRA"), prohibit just this sort of overbearing and oppressive governmental action.  Plaintiffs therefore seek relief in this Court to protect this most cherished of American rights.

2.      Plaintiffs are Catholic religious entities that provide a wide range of spiritual, educational, social and health care services to residents, both Catholic and non-Catholic alike, throughout Miami-Dade, Broward and Monroe Counties in southeast Florida.

3.      Plaintiff the Most Reverend Thomas G. Wenski ("Archbishop Wenski"), and his successor in office, is the Archbishop of the Archdiocese of Miami, a corporation sole (the "Archdiocese of Miami" or "Archdiocese"), a religious community inclusive of those Roman Catholic parishes and organizations located throughout Miami-Dade, Broward, and Monroe counties in Florida.  The Archdiocese of Miami carries out its mission directly, and through the work of affiliated Catholic entities such as Plaintiff Catholic Health Services, Inc. ("Catholic

Health Services"), and through Plaintiff Catholic Hospice, Inc. ("Catholic Hospice") (collectively, the "Miami Archdiocese Plaintiffs").

4.    Plaintiff Catholic Health Services is a Catholic healthcare organization headquartered in Lauderdale Lakes, Florida, whose mission is both guided by and consistent with the teachings of the Catholic Church.  Catholic Health Services provides health care and related services to all, regardless of religious faith.

5.    Plaintiff Catholic Hospice is a community-based, Catholic not-for-profit program headquartered in Miami Lakes, Florida, which has served the South Florida community since 1988 by providing end-of-life care to patients of all faiths.

6.    Plaintiffs' work is in every respect guided by and consistent with Roman Catholic beliefs.  Among those beliefs is the requirement to serve those in need, regardless of their religion.  This is perhaps best captured by words attributed to St. Francis of Assisi: "Preach the Gospel at all times.  Use words if necessary."  As Pope Benedict recently put it, "love for widows and orphans, prisoners, and the sick and needy of every kind, is as essential to [the Catholic Church] as the ministry of the sacraments and preaching of the Gospel.  The Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."  Pope Benedict XVI, *Deus Caritas Est* ¶ 22 (2006).

7.    Plaintiffs address the needs of Florida residents in numerous different ways.  The Archdiocese of Miami serves families through the education of the students attending its Catholic school systems, which are devoted to teaching a religiously and ethnically diverse student body.  The Archdiocese also provides charitable service throughout the Miami metropolitan area and the Florida Keys through dozens of programs undertaken by their respective parishes.

8.    Plaintiff Catholic Health Services offers a host of services to thousands of Catholics and non-Catholics in need throughout the Archdiocese of Miami, including a wide variety of health care facilities and services, such as personal care, home healthcare,  skilled nursing and long term care, inpatient and outpatient medical rehabilitation, hospice care, assisted living and elderly housing.  Catholic Health Services provides invaluable assistance and care to residents of all faiths in the greater Miami area, including the homeless and poor who would otherwise not be able to afford medical care.

9.    Plaintiff Catholic Hospice provides responsive end-of-life care for patients of all ages, and assists families in caring for loved ones with reverence and dignity. It provides its services with love, skill, compassion and respect for all human dignity -- regardless of race, creed or religious affiliation.  Part of its stated vision is to be the not-for-profit hospice provider of choice for Broward, Miami-Dade and Monroe counties by providing faith based compassionate care for persons at the end of life and support for those who love and care for them.  Catholic Hospice is committed to alleviating spiritual and emotional distress, as well as physical discomfort, so life may be enjoyed to the fullest.

10.  Catholic belief also includes the firm conviction that sexual union should be reserved to married couples who are so committed to each other that they are open to the creation of life.  Thus, artificial interference with the creation of life, including through abortion, sterilization, or contraception, is contrary to core Catholic doctrine.

11.  Defendants have promulgated various rules (collectively, "the U.S. Government Mandate"), as part of the 2010 Patient Protection and Affordable Care Act (the "Affordable Care Act" or the "Act"), that would require many Catholic and other religious organizations to provide health plans to their employees that include and/or facilitate coverage for abortion-

inducing drugs, sterilization, contraception and related counseling services in violation of their sincerely held religious beliefs.  The U.S. Government Mandate is subject to a narrow exemption (the "Exemption") for certain "religious employers" who can convince the Government that they satisfy four criteria:

- "The inculcation of religious values is the purpose of the organization";

- "The organization primarily employs persons who share the religious tenets of the organization";

- "The organization primarily serves persons who share the religious tenets of the organization"; and

- "The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."

Unlike broader religious exemptions available under other federal laws, the Exemption forces religious employers to seek a determination from a government bureaucrat that they are sufficiently "religious" before they can exercise their religious freedoms.

12.  Because of the narrow and vague terms of the Exemption, as well as the arbitrary and discretionary nature of the determination it calls for, Plaintiffs do not know whether they qualify for the Exemption or whether the Government will conclude that they do.  Before Plaintiffs can find out, they must submit to an intrusive and arbitrary governmental investigation based on principles inconsistent with the Catholic faith, as to whether in the view of Defendants: (i) Plaintiffs' "purpose"  is the "inculcation of religious values"; (ii) Plaintiffs "primarily" employ "persons who share [their] religious tenets," even though they hire employees of all faiths and may not know how many Catholics they employ; and (iii) Plaintiffs "primarily" serve Catholics, even though their schools and social services are open to all.

13.  Because Plaintiffs provide their services to persons in need without regard to religious affiliation, and do not consider religious affiliation in hiring for most positions, each of

the Plaintiffs is uncertain as to whether it qualifies as a "religious employer" under the Exemption.  None of the Plaintiffs maintains comprehensive statistics on the number of Catholics and non-Catholics employed at and served by their various offices and facilities.

14.  The Exemption's narrow definition of "religious employer" likely excludes Plaintiffs Catholic Health Services and Catholic Hospice, even though they are "religious" organizations under any reasonable definition.  Consequently, to attempt to qualify as a "religious employer," these Plaintiffs may be required to stop providing educational opportunities to non-Catholics throughout the Miami area, stop serving non-Catholics in the state, and fire all non-Catholic employees – actions that would run counter to their Catholic faith and commitment to serve all in need without regard to religion.

15.  Regardless of the outcome of the Government's inquiry, Plaintiffs strongly object to such an intrusive, arbitrary, and misguided governmental investigation into Plaintiffs' religious missions.

16.  The U.S. Government Mandate and its purported Exemption are irreconcilable with the First Amendment, RFRA, and other laws.  The Government has not shown any compelling interest in forcing Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing drugs, sterilization, and contraception, or for requiring Plaintiffs to submit to an intrusive and discretionary governmental examination of their religious missions.  Nor has the Government shown that the U.S. Government Mandate is narrowly tailored to advance the Government's interest in ensuring access to these services, given that such services are already widely available and nothing prevents the Government from providing or paying for them directly through a duly enacted law.  The Government, therefore, cannot justify its decision to force Plaintiffs to

provide, pay for, and/or facilitate access to these services in violation of Plaintiffs' sincerely held religious beliefs.

17.   Accordingly, Plaintiffs respectfully request that the Court enter an order declaring that the U.S. Government Mandate is contrary to the First Amendment, RFRA, and the Administrative Procedure Act ("APA"), and therefore invalid.  Plaintiffs further request that this Court enjoin Defendants from enforcing the U.S. Government Mandate against Plaintiffs.

## THE PARTIES

### ARCHBISHOP WENSKI AND THE ARCHDIOCESE OF MIAMI

18.    The Archdiocese of Miami is a corporation sole with its principal place of business in Miami Shores, Florida.  It was first created as a diocese on October 7, 1958, then made an archdiocese on March 2, 1968, and is now and has always been organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code ("IRC").

19.    Archbishop Wenski, in his capacity as Archbishop of the Archdiocese of Miami, is responsible for serving more than 730,000 Catholics residing among 102 parishes  and missions located throughout the counties of Broward, Miami-Dade, and Monroe.

20.    Archbishop Wenski is assisted in his ministry by a staff of clergy, religious brothers and sisters, and lay people.  Except where religion is a bona fide requirement for fulfilling a job requirement, the Archdiocese imposes no religious litmus test on its employees and employs Catholics and non-Catholics alike.

21.    The Archdiocese of Miami carries out a tripartite spiritual, educational, and social service mission largely through its parishes.  Through the ministry of its priests, the Archdiocese of Miami ensures the regular availability of the Sacraments to all Catholics living in or visiting the Miami metropolitan area and the Florida Keys.

22.     The Archdiocese of Miami operates an extensive parochial school system, with over 30,000 students in 50 Catholic elementary/middle schools, 9 Catholic high schools and two Catholic non-residential schools for the disabled.  It also oversees and administers a Catholic university, St. Thomas University, which enrolls and educates more than  2,400 students.

### CATHOLIC HEALTH SERVICES

23.     Catholic Health Services is a nonprofit Florida corporation organized exclusively for charitable, religious, and educational purposes within the meaning of IRC § 501(c)(3).

24.     Catholic Health Services employs more than 2,000 full-time employees at its acute medical rehabilitation centers, skilled nursing centers, elderly and handicapped housing facilities, a hospice facility, child care centers, and other facilities and agencies.  Except when religious affiliation is an integral requirement for a particular position, Catholic Health Services does not inquire about the religious commitments of its applicants for employment.  As a result, it does not know how many of its employees are Catholic.

25.     The Catholic Health Services System is "the largest comprehensive post acute care provider in the southeast United States, [and it] has provided over $10 million in community benefit services each year."

26.     Catholic Health Services provides numerous healthcare, housing, and educational services to Catholics and non-Catholics alike.  Its mission is "[t]o provide health care and services to those in need, to minimize human suffering, to assist people to wholeness, and to nurture an awareness of their relationship with God."  It seeks to "improve the health, independence and spiritual life of the elderly, the poor, and the needy in the Archdiocese [of Miami] [through] managing care and providing services; facilitating transitions across levels of care; community partnerships and collaboration; and advocacy efforts."  Catholic Health

Services does not keep statistics on the religious affiliation of its employees and patients across all of its facilities. A substantial number of the patients who receive care at Catholic Health Services's long-term residential and inpatient facilities are not Catholic.

27.     Catholic Health Services provides multiple health care and housing-related services to its patients and residents, including skilled nursing facilities, medical rehabilitation facilities, assisted living facilities, elderly housing facilities,  hospice inpatient and community based services, and home health care services.  Financial assistance for these services is available to needy patients and residents who meet certain income requirements.

28.     Catholic Health Services also  provides administrative services for five Centro Mater Child Care Services facilities throughout the Miami-Dade County area.  These facilities offer infant and toddler preschool, after-school, and summer camp programs for children of low-income families to promote success in elementary education.  Centro Mater provides services to children and families regardless of race, creed, or religious affiliation.  Originally founded in 1968 in Miami to serve recently arrived Cuban immigrants, Centro Mater has since expanded to five different locations "to provide outreach to previously underserved neighborhoods where immigrants, suffering from the numerous ravages of socio-economic disadvantages, are concentrated."  In February 2010, Catholic Health Services introduced its "Centro Mater West EHS Home Based option using home visiting as a method of service delivery. It is a way to offer support, guidance, information, and child development services directly to families in their homes."  The Centro Mater facilities also provide physical examinations, dental services, immunizations, laboratory tests, vision screening, and follow-up plans for its students.

### CATHOLIC HOSPICE

29.     Catholic Hospice is a nonprofit Florida corporation organized exclusively for charitable, religious, and educational purposes within the meaning of IRC § 501(c)(3).

30.     For over 20 years, Catholic Hospice has provided compassionate care for the terminally ill and their families in the counties of Broward, Miami-Dade and Monroe.  "Through education and example, Catholic Hospice gives testimony that dying is a part of life which permits the culmination of all life events to come together in a most profound way."

31.      Catholic Hospice provides many end-of-life related services to the terminally ill and their families, including medical care and nursing services, assistance with insurance paperwork and other matters of financial concern, pain control and symptom management, dietary guidance, spiritual and emotional support "in accordance with the family's own religious network," and professional grief counseling and support.

32.     Catholic Hospice provides these services to people regardless of their religious beliefs.  It therefore does not keep precise statistics on how many of its residents and patients are Catholic.

33.     Except when religious affiliation is an integral requirement for a particular position, Catholic Hospice does not inquire about the religious commitments of its applicants for employment.  As a result, it does not know how many of its employees are Catholic.

### THE IMPACTED HEALTH PLANS

34.     The Archdiocese of Miami offers a health plan ("the Archdiocese Plan") to its employees that is administered through Blue Cross Blue Shield, which is not a party to this lawsuit.  Plaintiff Catholic Health Services also offers coverage to its employees through the

Archdiocese Plan.  The Archdiocese Plan does not cover abortion-inducing drugs or sterilization.

Contraceptives are also not covered by the Archdiocese Plan.

35.     Catholic Hospice offers its own health plan to its employees (The "Hospice

Plan"), which is administered through Coventry Health Care of Florida, also not a party to this

lawsuit.  The Hospice Plan does not cover abortion-inducing drugs, sterilization, or

contraceptives.

36.     Because the Archdiocese of Miami has made significant modifications to the

Archdiocese Plan since March 23, 2010, Plaintiffs believe that the Archdiocese Plan does not

meet the Affordable Care Act's definition of a "grandfathered plan."

37.     The Archdiocese Plan year begins on July 1.

38.     Catholic Hospice, however, believes that the Hospice Plan currently meets the

Affordable Care Act's definition of a "grandfathered plan."

39.     The Hospice Plan year begins on July 1.

40.     Even though the Hospice Plan appears to be a "grandfathered" plan, Catholic

Hospice is currently barred from altering its plan, even in the best interests of its employees, for

fear of losing its putative grandfathered plan status.  Without judicial review, Catholic Hospice

will continue to suffer hardship.

41.  In any event, the Hospice Plan will lose its grandfathered status in the near future

for reasons that cannot be avoided.  For example, the employer contribution to the premium

cannot decrease by more than 5% of the cost of coverage compared to the employer contribution

on March 23, 2010.  26 C.F.R. §54.9815-1251T(g)(1)(v).  Given the current trajectory of health

care costs, Catholic Hospice anticipates that it will be unable to continue to pay within five

percentage points of what it had paid in 2010, which was in many instances all or a significant

11

percentage of the cost of coverage.  Even the Government acknowledges that the number of grandfathered health plans will decrease substantially in the near future.  *See* 75 Fed. Reg. 41,726, 41,731 (July 19, 2010).

42.     An actual, justiciable controversy currently exists between Plaintiffs and Defendants.  Absent a declaration resolving this controversy and the validity of the U.S. Government Mandate, Plaintiffs are uncertain as to their rights and duties in planning, negotiating, and/or implementing their group health insurance plans, their hiring and retention programs, and their social, educational, and charitable programs and ministries, as described herein.

43.     Thus, Plaintiffs have standing to invoke the power of this Court to redress the injuries they are presently suffering and, in addition, other imminent injuries that they are likely to suffer in the near future.

### THE GOVERNMENT DEFENDANTS

44.     Defendant Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services.  She is named and sued in her official capacity.

45.     Defendant Hilda Solis is the Secretary of the U.S. Department of Labor.  She is named and sued in her official capacity.

46.     Defendant Timothy Geithner is the Secretary of the U.S. Department of Treasury. He is named and sued in his official capacity.

47.     Defendant U.S. Department of Health and Human Services ("HHS") is an executive agency of the United States within the meaning of RFRA and the APA.

48.     Defendant U.S. Department of Labor is an executive agency of the United States within the meaning of RFRA and the APA.

49.     Defendant U.S. Department of Treasury is an executive agency of the United States within the meaning of RFRA and the APA.

## JURISDICTION AND VENUE

50.     This is an action for declaratory and injunctive relief under 5 U.S.C. § 702, 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 2000bb-1(c).

51.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§  1331, 1343(a)(4), and 1346(a)(2).

52.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

## JURY TRIAL DEMANDED

53.     Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38 on all issues triable thereby.

## STATUTORY BACKGROUND

### THE AFFORDABLE CARE ACT

54.     On March 23, 2010, Congress enacted the Affordable Care Act.  *See* Pub. L. No. 111-148, 124 Stat. 119.  The Affordable Care Act significantly amended the Public Health Service Act by establishing many new requirements for "group health plans," broadly defined as "employee welfare benefit plans" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents."  42 U.S.C. § 300gg-91(a)(1).  The Act, for example, prohibits an employer's group health plan from excluding employees based on preexisting medical conditions, *see* Pub. L. No. 111-148 § 1201, 124 Stat. 154 (codified, as amended, at 42 U.S.C. § 300gg-3(a)), and requires the plan to provide dependent coverage to employees' children until they turn 26 years old, *see* Pub. L. No. 111-148 § 1001(5), 124 Stat. 132 (codified, as amended, at 42 U.S.C. § 300gg-14(a)).

55.     As relevant here, the Act requires an employer's group health plan to cover women's "preventive care."  Specifically, it states that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum[,] provide coverage for and shall not impose any cost sharing requirements for . . . (4) with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."  Pub. L. No. 111-148 § 1001(5), 124 Stat. 131 (codified at 42 U.S.C. § 300gg-13(a)(4)).  The prohibition on "cost sharing requirements" means that a qualified health plan must pay for the full cost of "preventive care" services, without any deductible or co-payment.

56.     "[T]he Affordable Care Act preserves the ability of individuals to retain coverage under a group health plan or health insurance coverage in which the individual was enrolled on March 23, 2010."  Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,731 (July 19, 2010); 42 U.S.C. § 18011.  These so-called "grandfathered health plans do not have to meet the requirements" of the U.S. Government Mandate, but only so long as the plans offer substantially the same benefits at substantially the same costs.  75 Fed. Reg. at 41,731.  HHS estimates that "98 million individuals will be enrolled in grandfathered group health plans in 2013."  Id. at 41,732.

57.     Several of the Act's provisions, along with other federal statutes, reflect a clear congressional intent that the executive agency charged with identifying the "preventive care" required by § 300gg-13(a)(4) should exclude all abortion-related services.  The Act itself states that "nothing in this title (or any amendment made by this title) shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health

14

benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i).  And the Act left to "the issuer of a qualified health plan," not the Government, the ability "[to] determine whether or not the plan provides coverage of [abortion]." *Id.* § 18023(b)(1)(A)(ii).  Likewise, the so-called Weldon Amendment, which has been included in every HHS and Department of Labor appropriations bill since 2004, states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat 786, 1111 (2011).

58.    The legislative history of the Act also demonstrates a clear congressional intent to prohibit the executive branch from requiring group health plans to provide abortion-related services.  The House of Representatives originally passed a bill that included an amendment by Congressman Bart Stupak expressly prohibiting the use of federal funds for abortion services. *See* H.R. 3962, 111th Cong. § 265 (Nov. 7, 2009).  The Senate version, however, lacked that restriction.  S. Amend. No. 2786 to H.R. 3590, 111th Cong. (Dec. 23, 2009).  The two respective bills contained many different provisions, and so they needed to be reconciled into a final bill passed by both houses.  After the passage of the Senate version, however, Senator Scott Brown won a special election in Massachusetts.  Any reconciled bill, therefore, was likely to face a filibuster in the Senate.  To avoid defeat, congressional proponents of the Act engaged in a procedure known as "budget reconciliation," which required the House to adopt the Senate version of the bill largely in its entirety.  Congressman Stupak and other pro-life House members, however, indicated that they would refuse to vote for the Senate version because it

failed adequately to prohibit federal funding of abortion.  To appease these Representatives, President Obama issued an executive order providing that no executive agency would authorize the federal funding of abortion services.  *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).  The Act was, therefore, passed on the central premise that all federal agencies would uphold and follow "longstanding Federal laws to protect conscience" and to prohibit federal funding of abortion services.  *Id.*  That executive order was consistent with a 2009 speech that President Obama gave at the University of Notre Dame, in which he promised that his Administration would honor the consciences of those who disagree with abortion, and draft sensible conscience clauses.

### THE U.S. GOVERNMENT MANDATE

59.     Less than two years later, however, Defendants promulgated the U.S. Government Mandate, subverting the Act's clear purpose to protect the rights of conscience. The U.S. Government Mandate, moreover, was implemented contrary to the normal procedural rules required for the promulgation and implementation of rules of this magnitude.

60.     In particular, on July 19, 2010, Defendants issued initial interim final rules (the "Interim Rules") concerning § 300gg-13(a)(4)'s requirement that group health plans provide coverage for women's "preventive care."  Interim Final Rules, 75 Fed. Reg. 41,726.  Defendants arbitrarily dispensed with notice-and-comment rulemaking for the Interim Rules, even though federal law had never previously required coverage of abortion-inducing drugs, sterilization procedures or contraceptives. Defendants offered as an excuse that the APA did not apply to the relevant provisions of the Affordable Care Act and that "it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final regulations in place until a full public notice and comment process was completed."  *Id.* at 41,730.

16

61.     The Interim Rules tracked the Affordable Care Act's statutory language.  It required that "a group health plan . . . must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or deductible) with respect to those items or services: . . . (iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, preventive care and screenings provided for in binding comprehensive health plan guidelines supported by the Health Resources and Services Administration."  Interim Final Rules, 75 Fed. Reg. at 41,728 (codified at 45 C.F.R. § 147.130(a)(iv)).

62.     The Interim Rules, however, failed to identify the specific women's "preventive care" services that Defendants planned to require employer group health plans to cover.  42 U.S.C. § 300gg-13(a)(4).  Instead, Defendants noted that "[t]he Department of HHS [was] developing these guidelines and expects to issue them no later than August 1, 2011."  Interim Final Rules, 75 Fed. Reg. at 41,731.

63.     Defendants permitted concerned entities to provide written comments about the Interim Rules.  *See id.* at 41,726.  But, as Defendants have conceded, they chose not to comply with the notice-and-comment requirements of the APA.  *Id.* at 41,730.

64.     In response, several groups lobbied to persuade Defendants to include various abortion-inducing drugs and contraceptives in the "preventive care" requirements for  group health plans.  *See, e.g.*, http://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-supports-initial-white-house-regulations-preventive-care-highlights-need-new-33140.htm.  Other commenters noted that "preventive care" could not reasonably be interpreted to include such practices.  These groups pointed out that pregnancy was not a disease that needed to be "prevented" and that a contrary view would intrude on the

sincerely held beliefs of many religiously affiliated organizations.  *See, e.g.*, Comments of United States Conference of Catholic Bishops, at 1-2 (Sept. 17, 2010), *available at* http://old.usccb.org/ogc/preventive.pdf.

65.    On August 1, 2011, HHS announced the "preventive care" services that group health plans would be required to cover under the U.S. Government Mandate.  *See* HHS, *Affordable Care Act Ensures Women Receive Preventive Services at No Additional Cost*, available at http://www.hhs.gov/news/press/2011pres/08/20110801b.html.  Again acting without notice-and-comment rulemaking, HHS announced these guidelines through a press release rather than enactments in the Code of Federal Regulations or statements in the Federal Register.  The press release made clear that the guidelines were developed by a non-governmental "independent" organization, the Institute of Medicine ("IOM").  *See id.*  The IOM's own report, in turn, included a dissent that suggested that the IOM's recommendations were made on an unduly short time frame dictated by political considerations and without the appropriate transparency for all concerned persons.

66.    HHS's guidelines required insurers and group health plans to cover  "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  *See* http://www.hrsa.gov/womensguidelines/.  FDA-approved contraceptives include drugs that induce abortions.  For example, the FDA has approved "emergency contraceptives," such as the morning-after pill (otherwise known as Plan B), which can prevent an embryo from implanting in the womb, and Ulipristal (otherwise known as HRP 2000 or ella), which can also induce abortions.  These guidelines are in stark contrast with the central compromise necessary for passing the Affordable Care Act and President Obama's promise to protect religious liberty.

### FINES AND PENALTIES

67.     Violations of the Affordable Care Act subject an employer and an insurer to substantial fines.

68.     Under the Internal Revenue Code, certain employers who fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" will be exposed to significant annual fines of $2,000 per full-time employee.  *See* 26 U.S.C. § 4980H(a), (c)(1).

69.     Additionally, under the Internal Revenue Code, group health plans that fail to provide certain required coverage may be subject to an assessment of $100 a day per individual. *See* 26 U.S.C. § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro, Cong. Research Serv., RL 7-5700, Enforcement of the Preventative Health Care Services Requirements of the Patient Protection and Affordable Care Act (2012) (asserting that this assessment applies to employers who violate the "preventive care" provision of the Affordable Care Act).

70.     Under the Public Health Service Act, the Secretary of HHS may impose a monetary penalty of $100 a day per individual where an insurer fails to provide the coverage required by the U.S. Government Mandate.  *See* 42 U.S.C. § 300gg-22(b)(2)(C)(i); *see also* Cong. Research Serv., RL 7-5700 (asserting that this penalty applies to insurers who violate the "preventive care" provision of the Affordable Care Act).

71.     ERISA may provide for additional fines.  Under ERISA, plan participants can bring civil actions against insurers for unpaid benefits.  29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700.  Similarly, the Secretary of Labor may bring an enforcement action against group health plans of employers that violate the U.S. Government Mandate, as incorporated by ERISA.  *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL 7-5700

(asserting that these fines can apply to employers and insurers who violate the "preventive care" provision of the Affordable Care Act).

## THE EXEMPTION

72.     Two days after HHS announced the guidelines, on August 3, 2011, Defendants issued amendments to the July 2010 Interim Rules (the "Amended Rule").  *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621 (Aug. 3, 2011).  Again, Defendants issued the Amended Rule without notice-and-comment rulemaking on the same claimed basis they had provided for bypassing the APA with the July 2010 Interim Rules.  *See id.* at 46,624.

73.     When announcing the Amended Rule, Defendants ignored the view that "preventive care" should exclude abortion-inducing drugs, sterilization procedures and contraceptives that do not prevent disease.  Instead, they noted only that "commenters [had] asserted that requiring group health plans sponsored by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom."  *Id.* at 46,623.  They then sought "to provide for a religious accommodation that respect[ed]" only "the unique relationship between a house of worship and its employees in ministerial positions."  *Id.*

74.     Specifically, the regulatory Exemption ignored the broader definitions of religious employers already existing in federal law.  Instead, the Exemption covered only those employers whose purpose is to inculcate religious values, and who employ and serve primarily individuals of the same religion.  Taken on its face, at least some of the Plaintiffs appear not to fit within these criteria.  The Exemption provides in full:

20

(A) In developing the binding health plan coverage guidelines specified in this paragraph (a)(1)(iv), the Health Resources and Services Administration shall be informed by evidence and may establish exemptions from such guidelines with respect to group health plans established or maintained by religious employers and health insurance coverage provided in connection with group health plans established or maintained by religious employers with respect to any requirement to cover contraceptive services under such guidelines.

(B) For purposes of this subsection, a "religious employer" is an organization that meets all of the following criteria:

(1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

*Id.* at 46,626 (codified at 45 C.F.R. § 147.130(a)(iv)(A)-(B)).

75.     The Exemption effectively excludes the health plans of religiously affiliated employers that do not discriminate in providing charitable, educational, and employment opportunities to all persons, regardless of religious faith.

76.     It is unclear whether, if an entity qualifies as a "religious employer" for purposes of the Exemption, any affiliated entity or association (such as Plaintiff Catholic Health Services) that provides coverage to its employees through the exempt entity's group health plan would also receive the benefit of the Exemption.  Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012).

77.     Moreover, under the Exemption the Government assumes exclusive and discretionary authority to determine whether an organization was sufficiently "religious" to qualify for the Exemption -- an unconstitutionally invasive inquiry into an organization's religious beliefs and practices.  For example, the Government must determine the "religious tenets" of an organization and the individuals it employs and serves; it must determine whether the organization "primarily" employs and "primarily" serves individuals who "share" the organization's "religious tenets"; and it must determine whether "the purpose" of the organization is the "inculcation of religious values."

78.     When issuing the Amended Rule, Defendants did not explain why they created such a narrow religious Exemption.  Nor did Defendants address why they refuse to incorporate the other "longstanding Federal laws to protect conscience" that President Obama promised to respect.  *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).  ERISA, for example, has long excluded "church plans" from its requirements.  *See* 29 U.S.C. §§ 1002(33)(C)(iv), 1003.  Likewise, the Affordable Care Act itself excludes from its requirement that all individuals maintain minimum essential coverage those individuals with religious objections to receiving benefits from public or private insurance.  26 U.S.C. §§ 1402(g)(1), 5000A(d)(2).

79.     Moreover, Defendants did not address whether they have a compelling interest to force religiously-affiliated employers to include services in their health plans that are contrary to their religious beliefs.  They failed to consider whether they could achieve their views of sound policy in a more religiously accommodating manner.

80.     Subsequently, the Defendants permitted parties to provide comments to the Amended Rule, which gave the appearance that Defendants were open to good-faith discussion. Numerous organizations expressed the same concerns that they had before, noting that the

mandated services should not be viewed as "preventive care."  They also explained that the

Exemption was "narrower than any conscience clause ever enacted in federal law and narrower

than the vast majority of religious exemptions from state contraceptive mandates."  Comments of

United States Conference of Catholic Bishops, at 1-2 (Aug. 31, 2011), *available at*

http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-to-hhs-on-

preventive-services-2011-08.pdf.

### THE TEMPORARY SAFE HARBOR

81.     Three months later, allegedly "[a]fter evaluating [the new] comments" to the

Amended Rule, Defendants gave their response.  Defendant Sebelius issued a short, Friday-

afternoon press release, announcing with little analysis or reasoning that HHS had decided to

keep the Exemption unchanged, but had also created a temporary enforcement safe harbor

whereby  "[n]onprofit employers who, based on religious beliefs, do not currently provide

contraceptive coverage in their insurance plan, will be provided an additional year, until August

1, 2013, to comply with the new law."  *See* HHS, A Statement by U.S. Department of Health and

Human Services Secretary Kathleen Sebelius, *available at*

http://www.hhs.gov/news/press/2012pres/01/20120120a.html.  As noted by Cardinal Timothy

Dolan, the release effectively gave objecting religious institutions "a year to figure out how to

violate [their] consciences."

82.     On February 10, 2012, the White House held a press conference and issued

another press release about the U.S. Government Mandate.  The White House announced that it

had come up with a "solution" by which the insurance companies of religious organizations that

object to providing abortion-inducing drugs, sterilization, or contraception services "will be

required to directly offer . . . contraceptive care [to plan participants] free of charge."  White

House, *Fact Sheet: Women's Preventive Services and Religious Institutions* (Feb. 10, 2012),

*available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html.

83.     Defendants later explained in the Federal Register that they "plan[ned] to initiate

a rulemaking to require issuers to offer insurance without contraception coverage to [an

objecting religious] employer (or plan sponsor) and simultaneously to offer contraceptive

coverage directly to the employer's plan participants (and their beneficiaries) who desire it, with

no cost-sharing."  Group Health Plans and Health Insurance Issuers Relating to Coverage of

Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725,

8728 (Feb. 15, 2012).  Defendants further asserted that the rulemaking would "achieve the same

goals for self-insured group health plans."  *Id.*

84.     Defendants then "finalize[d], without change," the Amended Rule containing the

religious employer Exemption, 77 Fed. Reg. at 8729, and issued guidelines regarding the

previously announced "temporary enforcement safe harbor" for "non-exempted, non-profit

religious organizations with religious objections to [contraceptive] coverage."  *Id.* at 8725; Ctr.

for Consumer Info. & Ins. Oversight, Guidance on the Temporary Enforcement Safe Harbor

(Feb. 10, 2012), *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-

Preventive-Services-Bulletin.pdf.

85.     On March 16, 2012, Defendants issued an Advance Notice of Proposed

Rulemaking ("ANPRM") seeking comment on various ways to structure the proposed

accommodation.  Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg.

16,501 (Mar. 21, 2012).  The proposed scenarios require an "independent entity" to provide

coverage for the objectionable services at no cost to the participants.  But private entities do not

provide insurance coverage "for free."  Moreover, even if these proposals were ever adopted,

they would still require religious organizations to pay for and/or facilitate access to the objectionable services.  Finally, it is also unclear whether the Government has statutory authority to implement each of the possibilities referenced in the ANPRM.

86.    The ANPRM itself does not alter the existing U.S. Government Mandate.  Rather, it expresses a vague and non-binding intention to do so at some undefined time in the future. Even a promise to modify the law, whether issued by the White House or in the form of an ANPRM, does not, in fact, alter the law.  The U.S. Government Mandate is and remains the current, operative law. Plaintiffs have until the start of the next plan year following August 1, 2013, to come into compliance with the U.S. Government Mandate.

## THE U.S. GOVERNMENT MANDATE SUBSTANTIALLY BURDENS PLAINTIFFS' RELIGIOUS BELIEFS

87.    Freedom of conscience and religious practice drove the founding of our nation. As noted by Thomas Jefferson, "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of civil authority."

88.    The U.S. Government Mandate seeks to require Plaintiffs to pay for, provide, and/or facilitate access to services that are contrary to their core religious convictions.  The U.S. Government Mandate thus substantially burdens Plaintiffs' firmly held religious beliefs and practices.

89.    The U.S. Government Mandate also seeks to compel Plaintiffs to fund related "patient education and counseling for all women with reproductive capacity."  It therefore compels Plaintiffs to pay for, provide, and/or facilitate speech that is contrary to their firmly held religious beliefs.

90.    On February 8, 2012, Archbishop Wenski of the Archdiocese of Miami wrote a column noting: "To force all of us to buy coverage for sterilization and contraceptives, including drugs that induce abortion, is a radical incursion into freedom of conscience."  Contraceptive

Mandate Violates Freedom of Conscience, Archbishop Thomas Wenski (Feb. 8, 2012), *available at* http://www.miamiarch.org/ip.asp?op=Article_1228123516108.

91.     On May 21, 2012, Archbishop Wenski issued a statement to his parishioners, stating:

> [The Freedom of Religion] is rooted in the dignity of every human person and as Americans and Catholics we are obliged to defend this religious right for ourselves and others. . . .   Our government's efforts to "accommodate" the Church's objections based on religious freedom is not a fix. This HHS mandate still requires religious organizations to sponsor and subsidize health insurance plans that include drugs and procedures that are found morally objectionable. Many of this country's Catholic dioceses, hospitals, schools, and entities are self-insured, so costs for mandated coverage, although a violation of our freedom and beliefs, will have to be accepted and absorbed by the religious institution.

Archbishop Thomas Wenski Comments on Lawsuits Filed Against HHS Mandate (May 21, 2012), *available at* http://www.miamiarch.org/ip.asp?op=Article_12521162058324.

92.     The Government does not give Plaintiffs the option of avoiding the U.S. Government Mandate by leaving the health care market.  Eliminating their employee group health plans might expose Plaintiffs to substantial fines or penalties.  Meanwhile, Plaintiffs' employees would be left scrambling for health insurance.

93.     Nor would the ANPRM – even if it were law, which it is not – relieve Plaintiffs from the untenable and unconscionable position in which the U.S. Government Mandate currently puts them.

94.     First, the promised "accommodation" would not alter the fact that Plaintiffs would be required to facilitate practices that run directly contrary to their religious beliefs.  Catholic teaching does not simply require Catholic institutions to avoid ***directly paying*** for practices that are viewed as intrinsically immoral.  It also requires them to avoid actions that ***facilitate*** those practices.

95.     Second, any requirement that insurance companies or other independent entities provide preventive services "free of charge" is illusory.  For-profit entities do not provide services for free.  Instead, increased costs are passed through to consumers in the form of higher premiums or fees.  Under the Proposed Accommodation, doctors will still have to be paid to prescribe the objectionable services and drug companies and pharmacists will still have to be paid for providing them.

96.     Third, the "accommodation" does not affect the narrow Exemption applicable to "religious employers."  Before they may even qualify for the narrow Exemption, religious organizations must submit to an invasive governmental inquiry conducted by the Government, under the direction of Secretary Sebelius, regarding their purpose and religious beliefs. Requiring Plaintiffs to submit to this government-conducted test to determine if Plaintiffs are sufficiently religious is inappropriate and substantially burdens their firmly held religious beliefs.

97.     It is unclear how the Government defines or will interpret "purpose."

98.     It is unclear how the Government defines or will interpret vague terms, such as "primarily," "share," and "religious tenets."

99.     It is unclear how the Government will ascertain the "religious tenets" of an organization, those it employs, and those it serves.

100.    It is unclear how much overlap the Government will require for religious tenets to be "share[d]."

101.    Any attempt by Plaintiffs to qualify for the narrow religious employer Exemption by restricting their charitable and educational mission to Catholics only would have devastating effects on the communities Plaintiffs serve.

102.   Finally, the U.S. Government Mandate burdens Plaintiffs' religious beliefs right now.  Plaintiffs cannot wait until August 1, 2013, to determine how to respond to the U.S. Government Mandate.

103.   In short, while the President claimed to have "f[ou]nd a solution that works for everyone" and that ensures that "[r]eligious liberty will be protected," his Proposed Accommodation does neither.

### THE U.S. GOVERNMENT MANDATE IS NOT A NEUTRAL LAW OF GENERAL APPLICABILITY

104.   The U.S. Government Mandate is not a neutral law of general applicability.  It offers multiple exemptions from its requirements that employer-based health plans include or facilitate coverage for abortion-inducing drugs, sterilization, contraception, and related education and counseling.  It was, moreover, implemented by and at the behest of individuals and organizations who expressly disagree with certain religious beliefs regarding abortion, sterilization, and contraception, and thus targets religious organizations for disfavored treatment.

105.   The Government has also crafted the Exemption to favor certain religions over others.  It applies only to plans sponsored by those religious organizations that have, as their "purpose" the "inculcation of religious values"; that "primarily" serve only individuals that share their "religious tenets"; and that "primarily" employ such individuals.  45 C.F.R. § 147.130(a)(iv)(B).

106.   While the Exemption may protect some of the Defendants' favored religious organizations, it does not appear to protect the many Catholic and other religious organizations that educate students, provide vital services to the needy, and employ individuals of all faiths. Yet, because these organizations do not consider religious affiliation in hiring for most positions, or consider the religious affiliation of those they serve, they appear to be denied the Exemption.

The U.S. Government Mandate thus discriminates against such religious organizations because of their religious commitment to educate, serve, and employ people of all, or no, faiths.

### THE U. S. GOVERNMENT MANDATE IS NOT THE LEAST RESTRICTIVE MEANS OF FURTHERING A COMPELLING GOVERNMENTAL INTEREST

107.   The U.S. Government Mandate is not narrowly tailored to promote a compelling governmental interest.

108.   The Government has no compelling interest in forcing Plaintiffs to violate their firmly held religious beliefs by requiring them to provide, pay for, or facilitate access to abortion-inducing drugs, sterilizations, and contraceptives.  The Government itself has relieved other employers from this requirement by exempting plans of employers it deems to be sufficiently religious. These services are already widely available in the United States, and the U.S. Supreme Court has held that individuals have a constitutional right to them.

109.   Even assuming that the interest were compelling – which it is not – the Government has numerous alternatives to furthering that interest other than forcing Plaintiffs to violate their religious beliefs.  For example, the Government could provide or pay for the objectionable services through expansion of its existing network of family planning clinics funded by HHS or though other programs established by a duly enacted law.  Or, at a minimum, it could create a broader exemption for religious employers, such as those found in numerous federal and state statutes.  The Government cannot demonstrate that requiring Plaintiffs to violate their religious beliefs is the least restrictive means of furthering its claimed interest.

110.   The U.S. Government Mandate, moreover, burdens religious freedom while simultaneously undermining the very interests it ostensibly tries to promote by interfering with entities (like Plaintiffs) that serve our society's neediest individuals.

**THE U.S. GOVERNMENT MANDATE AND EXEMPTION PRODUCE AN EXCESSIVE
ENTANGLEMENT BETWEEN GOVERNMENT AND RELIGION**

111.   The U.S. Government Mandate's religious employer Exemption further excessively entangles the Government in defining the purpose and religious tenets of each organization and its employees and beneficiaries.

112.   In order to determine whether a religious organization qualifies for the Exemption, the Government would have to identify the organization's "religious tenets" and determine whether "the purpose" of the organization is to "inculcate" those tenets.

113.   The Government would then have to conduct an inquiry into the practices and beliefs of the individuals that the organization ultimately employs and educates.

114.   The Government would then have to compare and contrast those religious practices and beliefs to determine whether and how many of them are "share[d]."

115.   Regardless of outcome, this inquiry is unconstitutional, and Plaintiffs strongly object to such an intrusive governmental investigation into an organization's religious mission.

116.   The Exemption is based on an improper Government determination that "inculcation" is the only legitimate religious purpose.

117.   The Government should not base exemption on an assessment of the "purity" or legitimacy of an institution's  religious purpose.

118.   By limiting that legitimate purpose to "inculcation," at the expense of other sincerely held religious purposes, the U.S. Government Mandate and the Exemption interfere with religious autonomy.  Religious institutions have the right to determine their own religious purpose, including religious purposes broader than "inculcation," without Government interference and without losing their religious liberties.

30

119.    Defining religion based on employing and serving primarily people who share the organization's religious tenets directly contradicts Plaintiffs sincerely held religious beliefs regarding their religious mission to serve all people, regardless of whether or not they share the same faith.

### THE U.S. GOVERNMENT MANDATE IS CAUSING PRESENT HARDSHIP

120.    The U.S. Government Mandate is already causing serious, ongoing hardship to Plaintiffs that merits judicial relief now.

121.    Health plans cannot and do not arise overnight.  A number of analyses, negotiations and decisions must occur each year before Plaintiffs can develop, procure and offer to their employees a health benefits package.  For example, the Archdiocese of Miami must consult and negotiate with Blue Cross Blue Shield to determine the cost of the products and services it wants to offer to its employees and the employees of affiliated entities.  Catholic Hospice faces similar immediate challenges in negotiating the terms of its insurance plan with Coventry Health Care.  The process of determining the health care package for a plan year requires a substantial amount of time before the plan year actually begins.

122.    The multiple levels of uncertainty swirling around the U.S. Government Mandate and the ANPRM make the already lengthy process of preparing a compliant health benefits package even more complex.

123.   For example, if Plaintiffs decide that the only plausible option is to attempt to qualify as a "religious employer" under the Exemption, they will need to undertake a major overhaul of their corporate structures, hiring practices, and the scope of their programming. Such a process could take years.  And, if they are forced to employ only Catholics so as to come within the confines of the Exemption, their hiring options would be diminished.

124.    In addition, if Plaintiffs do not comply with the U.S. Government Mandate, they may be subject to annual government fines and penalties.  Plaintiffs require time to budget for any such additional expenses.

125.    Moreover, given the lack of proper notice-and-comment rulemaking regarding the guidelines for "preventive care" services, and the Amended Rule and Exemption, Plaintiffs have no available administrative remedy.  And, in any event, further administrative efforts to obtain relief would be futile since the relevant agencies and officers lack the authority to resolve the statutory and constitutional claims at issue here, among other reasons.

126.    The U.S. Government Mandate may require an immediate and significant change in the Plaintiffs' conduct of their affairs.  Plaintiffs need judicial relief now in order to prevent the serious, ongoing harm that the U.S. Government Mandate is already imposing on them.

127.    Thus, an actual, justiciable controversy currently exists between Plaintiffs and Defendants.  Absent a declaration resolving this controversy and the validity and applicability of the U.S. Government Mandate, Plaintiffs are uncertain as to their rights and duties in planning, negotiating, and/or implementing their group health insurance plans, their hiring and retention programs, and their social, educational, and charitable programs and ministries, as described herein.  Plaintiffs have an actual, well-founded fear that the U.S. Government Mandate will be enforced against them.

128.    Plaintiffs have standing to invoke the power of this Court to redress the injuries they are presently suffering and, in addition, other imminent injuries that they are likely to suffer in the near future.

129.    Accordingly, Plaintiffs seek an order vacating the U.S. Government Mandate and declaring that it violates the First Amendment, RFRA, and the APA.  Plaintiffs further request

that the Court enter an injunction prohibiting the Defendants from enforcing the U.S.

Government Mandate as against them.  Absent such a declaration of rights and award of

injunctive relief by this Court, Plaintiffs will be irreparably harmed and have no adequate

remedy at law.  The balance of harms and public policy further favor injunctive relief.

<u>CAUSES OF ACTION</u>

<u>COUNT I</u>

<u>SUBSTANTIAL BURDEN ON RELIGIOUS EXERCISE
IN VIOLATION OF RFRA</u>

130.    Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1

through 129 hereinabove.

131.    RFRA prohibits the Government from substantially burdening an entity's exercise

of religion, even if the burden results from a rule of general applicability, unless the Government

demonstrates that the burden (i) furthers a compelling governmental interest, and (ii) is the least

restrictive means of furthering that interest.

132.    RFRA protects organizations as well as individuals from substantial Government-

imposed burdens on religious exercise.

133.    RFRA applies to all federal law and the implementation of that law by any

branch, department, agency, instrumentality, or official of the United States.

134.    The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or

facilitate practices and speech that are contrary to Plaintiffs' core religious beliefs.

135.    In order to qualify for the Exemption to the U.S. Government Mandate, Plaintiffs

must submit to an intrusive governmental inquiry into their religious beliefs.

136.    The U.S. Government Mandate thereby substantially burdens Plaintiffs' exercise

of religion.

Case 1:12-cv-23820-DLG   Document 1   Entered on FLSD Docket 10/19/2012   Page 34 of 49

137. Defendants have no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

138. Requiring Plaintiffs to comply with the U.S. Government Mandate is not the least restrictive means of furthering any compelling governmental interest.

139. By enacting and threatening to enforce the U.S. Government Mandate against Plaintiffs, Defendants have violated RFRA.

140. Plaintiffs have no adequate remedy at law.

141. The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT II

### SUBSTANTIAL BURDEN ON RELIGIOUS EXERCISE IN VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT

142. Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

143. The Free Exercise Clause of the First Amendment prohibits the Government from substantially burdening an entity's exercise of religion.

144. The Free Exercise Clause protects organizations as well as individuals from Government-imposed burdens on religious exercise.

145. The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs.

146. In order to qualify for the Exemption to the U.S. Government Mandate, Plaintiffs must submit to an intrusive governmental inquiry into their religious beliefs.

147. The U.S. Government Mandate (including the Exemption) substantially burdens Plaintiffs' exercise of religion.

34

148.    The U.S. Government Mandate is not a neutral law of general applicability, because it is riddled with arbitrary exemptions.  It offers multiple exemptions from its requirement that employer-based health plans include or facilitate coverage for abortion-inducing drugs, contraception, sterilization, and related education and counseling.

149.    The U.S. Government Mandate is not a neutral law of general applicability, because it discriminates against certain religious viewpoints and targets certain religious organizations for disfavored treatment.  Defendants enacted the U.S. Government Mandate despite being aware of the substantial burden it would place on Plaintiffs' exercise of religion.

150.    The U.S. Government Mandate implicates constitutional rights in addition to the right to free exercise of religion, including, for example, the rights to free speech and to freedom from excessive government entanglement with religion.

151.    Defendants have no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

152.    The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

153.    By enacting and threatening to enforce the U.S. Government Mandate, Defendants have burdened Plaintiffs' religious exercise in violation of the Free Exercise Clause of the First Amendment.

154.    Plaintiffs have no adequate remedy at law.

155.    The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT III

### EXCESSIVE ENTANGLEMENT IN VIOLATION OF THE
### FREE EXERCISE AND ESTABLISHMENT CLAUSES OF THE FIRST AMENDMENT

156.    Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

157.    The Free Exercise and Establishment Clauses of the First Amendment prohibit intrusive government inquiries into the religious beliefs of individuals and institutions, and other forms of excessive entanglement between religion and Government.

158.    This prohibition on excessive entanglement protects organizations as well as individuals.

159.    The Exemption applies only after the Government conducts an invasive investigation into an organization's religious beliefs, including whether the organization's "purpose" is the "inculcation of religious values" and whether the organization "primarily employs" and "primarily serves" individuals who share the organization's religious tenets.

160.    The U.S. Government Mandate thus requires the Government to engage in invasive inquiries and discretionary judgments regarding questions of religious belief or practice.

161.    The U.S. Government Mandate results in an excessive entanglement between religion and Government.

162.    The enactment and impending enforcement of the U.S. Government Mandate violate the Free Exercise and the Establishment Clauses of the First Amendment.

163.     The U.S. Government Mandate is therefore unconstitutional and invalid.

164.    Plaintiffs have no adequate remedy at law.

165.    The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT IV

### RELIGIOUS DISCRIMINATION IN VIOLATION OF THE
### FREE EXERCISE AND ESTABLISHMENT CLAUSES OF THE FIRST AMENDMENT

166.    Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

167.    The Free Exercise Clause and the Establishment Clause of the First Amendment require the equal treatment of all religious faiths and institutions, without discrimination or preference.

168.    This requirement of equal treatment protects organizations as well as individuals.

169.    The U.S. Government Mandate's narrow Exemption for certain "religious employers" but not others discriminates on the basis of religious views or religious status.

170.    The U.S. Government Mandate's definition of religious employer likewise discriminates among different types of religious entities based on the nature of those entities' religious beliefs or practices.

171.    The U.S. Government Mandate's definition of religious employer furthers no compelling governmental interest.

172.    The U.S. Government Mandate's definition of religious employer is not narrowly tailored to further any compelling governmental interest.

173.    The enactment and impending enforcement of the U.S. Government Mandate violate the Free Exercise Clause and the Establishment Clause of the First Amendment.

174.    Plaintiffs have no adequate remedy at law.

175.    The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT V

### INTERFERENCE IN MATTERS OF INTERNAL CHURCH GOVERNANCE IN VIOLATION OF THE FREE EXERCISE AND ESTABLISHMENT CLAUSES OF THE FIRST AMENDMENT AND RFRA

176.    Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

177.    The Free Exercise and Establishment Clauses protect the freedom of religious organizations to decide for themselves, free from governmental interference, matters of church governance as well as those of faith and doctrine.

178.    The Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, ministers, or doctrine.

179.    Moreover, the Government may not interfere with a religious organization's internal decision if that interference would affect the underlying faith and mission of the organization itself.

180.    Plaintiffs are religious organizations affiliated with the Roman Catholic Church.

181.    The Catholic Church views abortion, sterilization, and contraception as intrinsically immoral and prohibits Catholic organizations from furnishing, condoning, or facilitating those practices.

182.    Plaintiffs have abided and must continue to abide by the decision of the Catholic Church on these issues.

183.    The Government may not interfere with, or otherwise question, the final decision of the Catholic Church that its religious organizations must abide by these core beliefs and teachings.

184.    Plaintiffs have therefore made the internal decision that the health plans they offer to their employees may not cover, subsidize, or facilitate abortion-inducing drugs, sterilization,

38

or contraception.

185.   The U.S. Government Mandate interferes with Plaintiffs' internal decisions concerning their structure and mission by requiring them to facilitate practices that directly conflict with Catholic teachings and beliefs.

186.   The U.S. Government Mandate's interference with Plaintiffs' internal decisions affects their faith and mission by requiring them to facilitate practices that directly conflict with their religious beliefs.

187.   Because the U.S. Government Mandate interferes with the internal decision-making of Plaintiffs in a manner that affects their faith and mission, it violates the Establishment and Free Exercise Clauses of the First Amendment.

188.   Plaintiffs have no adequate remedy at law.

189.   The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VI

### COMPELLED SPEECH IN VIOLATION OF
### THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT

190.   Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

191.   The First Amendment prohibits the Government from compelling affirmation of any religious or ideological proposition that the speaker finds unacceptable.

192.   The First Amendment protects organizations as well as individuals against compelled speech.

193.   Expenditures are a form of speech protected by the First Amendment.

194.    The First Amendment protects against the use of a speaker's money to support a viewpoint that conflicts with the speaker's religious beliefs.

195.    The U.S. Government Mandate compels Plaintiffs to provide health care plans to its employees that include or facilitate coverage of practices that violate their religious beliefs.

196.    The U.S. Government Mandate compels Plaintiffs to subsidize, promote, and facilitate education and counseling services regarding these practices.

197.    By imposing the U.S. Government Mandate, Defendants are compelling Plaintiffs publicly to subsidize or facilitate activity and speech that are contrary to their religious beliefs.

198.    The U.S. Government Mandate is viewpoint-discriminatory and subject to strict scrutiny.

199.    The U.S. Government Mandate furthers no compelling governmental interest.

200.    The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

201.    Plaintiffs have no adequate remedy at law.

202.    The U.S. Government Mandate imposes an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VII

### FAILURE TO CONDUCT NOTICE-AND-COMMENT RULEMAKING AND IMPROPER DELEGATION IN VIOLATION OF THE APA

203.    Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

204.    The Affordable Care Act expressly delegates to an administrative agency within HHS discretionary responsibility for establishing guidelines concerning the "preventive care" that group health plans and health insurance issuers must provide.

40

205.    Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines. Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

206.    Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law.

207.    Defendants, instead, improperly delegated their discretionary governmental responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM, which is not accountable to the public.

208.    The IOM did not permit or provide for the broad public comment otherwise required under the APA.  Indeed, the dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

209.    Within two weeks of the IOM issuing its guidelines, HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act.

210.    Defendants have never explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

211.    Defendants also failed to engage in notice-and-comment rulemaking when issuing the Interim and Amended Rules incorporating the guidelines.

212.    Defendants' stated reasons for promulgating these rules without engaging in formal notice-and-comment rulemaking do not constitute "good cause."  Providing proper public

notice and an opportunity for comment was not impracticable, unnecessary, or contrary to the public interest for the reasons claimed by Defendants.

213.    Defendants failed to observe a procedure required by law and violated 5 U.S.C. § 706(2)(D) by enacting the "preventive care" guidelines and the Interim and Amended Rules through improper delegation to a non-governmental entity and without engaging in notice-and-comment rulemaking.

214.    Plaintiffs have no available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

215.    Plaintiffs have no adequate remedy at law.

216.    The enactment of the U.S. Government Mandate without following the procedures required by law and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VIII

### UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY

217.    Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

218.    The United States Constitution vests all legislative power in the United States Congress.  Congress may not delegate its policymaking authority to an executive agency in the absence of an intelligible principle that limits and guides the agency's exercise of that authority.

219.    The Affordable Care Act expressly delegates authority to Defendant HHS to establish "comprehensive guidelines" for the services that group health plans and health insurance issuers must provide as  "preventive care" under the Act.

220.    The Act does not contain an intelligible principle or any other identifiable standard to which HHS is directed to conform in deciding which services do and do not qualify as "preventive care."

221.    For example, and as illustrated by the U.S. Government Mandate and Exemption, the Act purports to bestow unfettered discretion on HHS to mandate coverage for whatever medical services and procedures it deems to qualify as "preventive care" without any basis for concluding that the those services and procedures actually "prevent" a disease or adverse medical condition.  Also, HHS has used its unbounded discretion under the Act to claim for itself the authority to decide which entities will be subject to the U.S. Government Mandate and which will qualify for the Exemption.

222.    The Act's delegation of legislative authority violates the separation of powers principles of the United States Constitution.

223.    Plaintiffs have no adequate remedy at law.

224.    The enactment and impending enforcement of the U.S. Government Mandate pursuant to this unconstitutional delegation of authority impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT IX

### ARBITRARY AND CAPRICIOUS ACTION IN VIOLATION OF THE APA

225.    Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

226.    The APA condemns agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

227.    The APA further requires that an agency examine the relevant data and articulate an explanation for its action that includes a rational connection between the facts found and the policy choice made.

228.    Agency action is arbitrary and capricious under the APA if the agency has failed to consider an important aspect of the problem before it.

229.    A court reviewing an agency action may not supply a reasoned basis that the agency itself failed to offer.

230.    Defendants failed to consider the suggestion of many commenters that abortion, contraceptive, and sterilization services could not be viewed as "preventive care."

231.    Defendants failed adequately to take into account voluminous comments suggesting that the scope of the Exemption should be broadened.

232.    Defendants did not articulate a reasoned basis for their arbitrary actions by drawing a connection between facts found and the policy decisions it made.

233.    Defendants failed to consider or incorporate the use of broader religious exemptions in many other federal laws and regulations.

234.    Defendants' promulgation of the U.S. Government Mandate violated the APA.

235.    Plaintiffs have no available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

236.    Plaintiffs have no adequate remedy at law.

237.    The U.S. Government Mandate imposes an immediate and ongoing harm on the Plaintiffs that warrants relief.

## COUNT X

### ACTING ILLEGALLY IN VIOLATION OF THE APA

238.    Plaintiffs hereby repeat and re-allege the allegations set out in Paragraphs 1 through 129 hereinabove.

239.    The APA requires that all Government agency action, findings, and conclusions be made "in accordance with law."

240.    The U.S. Government Mandate and its Exemption are illegal and therefore in violation of the APA.

241.    The Weldon Amendment states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).

242.    The Affordable Care Act states that "nothing in this title (or any amendment by this title) shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i). It adds that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion.]" *Id.* § 18023(b)(1)(A)(ii).

243.    The Affordable Care Act contains no clear expression of an affirmative intention of Congress that employers with religiously motivated objections to the provision of health plans that include coverage for abortion-inducing drugs, sterilization, contraception, or related education and counseling should be forced to provide such plans.

45

244.   The U.S. Government Mandate nevertheless requires employer-based health plans to provide coverage for abortion-inducing drugs, contraception, sterilization, and related education.  By issuing the U.S. Government Mandate, Defendants have exceeded their authority and ignored the direction of Congress.

245.   The U.S. Government Mandate violates RFRA.

246.   The U.S. Government Mandate violates the First Amendment.

247.   The U.S. Government Mandate is not in accordance with law and thus violates 5 U.S.C. § 706(2)(A).

248.   Plaintiffs have no available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

249.   Plaintiffs have no adequate remedy at law.

250.   The enactment of the U.S. Government Mandate is not in accordance with law and its impending enforcement imposes an immediate and ongoing harm on Plaintiffs that warrants relief.

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

1.     Grant to Plaintiffs a trial by jury pursuant to Fed. R. Civ. P. 38 on all issues triable thereby;

2.     Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under RFRA;

3.     Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under the First Amendment;

4.     Enter a declaratory judgment that the U.S. Government Mandate was promulgated in violation of the APA;

5.      Enter an injunction prohibiting the Defendants from enforcing the U.S.

Government Mandate against Plaintiffs;

6.      Enter an order vacating the U.S. Government Mandate as to Plaintiffs;

7.      Award Plaintiffs their attorneys' and expert fees  and costs under 42 U.S.C.

§ 1988; and

8.      Award all other relief as the Court may deem just and proper.

Respectfully submitted, this the 19th day of October, 2012.

By: /s Roberto J. Diaz, Esq.
     Roberto J. Diaz, Esq.
     FL Bar No. 0084890
     J. Patrick Fitzgerald & Associates, P.A.
     110 Merrick Way, Suite 3-B
     Coral Gables, FL 33134
     Telephone 305-443-9162
     Telefax 305-443-6613
     rjd@jpfitzlaw.com

     *Counsel for all Plaintiffs*

     and

     E. Kendrick Smith (*pro hac vice application to be filed*)
     Janine Cone Metcalf (*pro hac vice application to be filed*)
     David M. Monde (FL Bar No. 88745—*pro hac vice application for S.D. Fla. to be filed*)
     Jason T. Burnette (*pro hac vice application to be filed*)
     James R. Williams (*pro hac vice application to be filed*)

     **JONES DAY**
     1420 Peachtree Street, N.E.
     Suite 800
     Atlanta, Georgia 30309
     Telephone: (404) 581-3939
     Facsimile (404) 581-8330
     eksmith@jonesday.com
     jmetcalf@jonesday.com
     dmmonde@jonesday.com
     jtburnette@jonesday.com
     jrwilliams@jonesday.com

     *Counsel for all Plaintiffs*

48

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of October, 2012, I caused a copy of the

foregoing to be served by United States mail, return receipt requested, to each party named on

the Summonses in this action.


/s Roberto J. Diaz_____
Roberto J. Diaz, Esq.
Florida Bar No. 0084890
rjd@jpfitzlaw.com